TABAK, MELLUSI & SHISHA LLP
29 Broadway
New York, New York 10006
Attorneys for Plaintiff
Tel: (212) 962-1590
Fax: (212) 385-0920

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - -X

CLAUDENE CHRISTIAN, Personal
Representative of the Estate of
CLAUDENE MARTILLA CHRISTIAN

               Plaintiff,

- against -                         **COMPLAINT**

HMS BOUNTY ORGANIZATION, LLC      **Plaintiff Demands**
and ROBERT E HANSEN               **Trial by Jury**

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

     Plaintiff, CLAUDENE CHRISTIAN, as the Personal Representative of the Estate of

CLAUDENE MARTILLA CHRISTIAN, alleges upon information and belief:

### JURISDICTION

     1.     Jurisdiction is predicated under 28 U.S.C. §1331 pursuant to the Jones Act 46

U.S.C. §30104, Death on the High Seas Act ("DOSHA") 46 U.S.C. §30302; 28 U.S.C §1332

diversity of citizenship and under 28 U.S.C. §1333 general maritime and admiralty law.

### THE PARTIES

     2.     CLAUDENE CHRISTIAN ("Plaintiff") is a citizen and resident of

Oklahoma.

     3.     Plaintiff is the mother of Claudene Martilla Christian ("Claudene").

4.     Claudene, until her death, was employed as a seaman aboard the HMS BOUNTY ("BOUNTY").   On October 29, 2012 at about 04:30 hrs, (4:30 am) BOUNTY with a crew of 16, capsized off the coast of North Carolina.  Claudene and the entire crew were either thrown or forced to jump into the water.   Approximately twelve hours later Claudene was found by a United States Coast Guard ("USCG") helicopter. She was brought aboard but attempts to resuscitate her were unsuccessful. The body of Captain Robin Walbridge was lost at sea and never recovered. All other crew survived.

5.      On February 25, 2013 the District Court of Oklahoma, Sequayah County, issued letters testamentary appointing Plaintiff as the personal representative of the Estate of Claudene Martilla Christian, see **Exh. 1**.

6.     At all relevant times, Defendant, HMS BOUNTY ORGANIZATION, LLC ("BOUNTY ORGANIZATION") was a limited liability corporation, whose principle place of business was at 20 Cedar Lane Setauket[1], New York, licensed to do business and doing business in the State of New York.  None of its members are citizens of Oklahoma.

7.     At all relevant times Defendant, ROBERT E. HANSEN ("HANSEN") was an officer and primary or sole share holder of BOUNTY ORGANIZATION.

8.     HANSEN is a citizen of New York and resides in Setauket, New York.

9.     BOUNTY was a wood sailing vessel, 108 feet in length, 36 feet in breadth, with tonnages of 266 gross and 181 net.   Her USCG assigned official number is 960956, her call sign WDD9114.  She was home ported in Greenport New York[2].

10.    BOUNTY's  history as stated on the public web site of BOUNTY ORGANIZATION is as follows:

---

[1] Setauket is located on the North Shore of Long Island in Suffolk County.
[2] Greenport is located on the North Fork of Long Island in Suffolk County.

"The Bounty was built in 1960 for MGM studios' Mutiny on the Bounty with Marlon Brando. Since then, the new Bounty has starred in several feature-length films and dozens of TV shows and historical documentaries. The studios commissioned the ship from the shipwrights of Smith and Ruhland in Lunenburg, Nova Scotia to commission a new Bounty to be built from scratch. Completely seaworthy and built just the way it would have been 200 years before, the new Bounty was constructed from the original ship's drawings still on file in the British admiralty archives. After filming and a worldwide promotional tour, MGM berthed the ship in St. Petersburg as a permanent tourist attraction - where she stayed until the mid-1980s. In 1986 Ted Turner acquired the MGM film library and the Bounty with it. He used it to promote his enterprises, and filmed Treasure Island with Charlton Heston in 1989. In 1993, Turner donated the ship to the Fall River Chamber Foundation, which established the Tall Ship Bounty Foundation to operate the ship as an educational venture.  In February of 2001 H.M.S. Bounty was purchased from the Foundation by HMS Bounty Organization LLC. She was in dire need for repairs at the time. It was decided to take her to Boothbay Harbor Maine "Samples Shipyard" Later to be known as Boothbay Harbor Shipyard. She is a replica of the original SV BOUNTY, built by MGM Studios in 1960 for the filming of the movie "Mutiny on the Bounty" starring Marlon Brando." [3]

11.     At all relevant times BOUNTY ORGANIZATION was the owner and operator of the vessel BOUNTY, and was Claudene's Jones Act employer.

## FACTS AND CIRCUMSTANCES LEADING TO DECEDENT'S DEATH

12.     At all relevant times, all or a majority of BOUNTY ORGANIZATION's shares were owed by HANSEN who acted as the BOUNTY's owner and manager, and who had final authority as to all matters pertaining to maintenance, crew training, manning, provisioning operation and seaworthiness of BOUNTY.

13.     At all relevant times, BOUNTY ORGANIZATION's shore staff consisted of a single employee, Ms. Tracie Simonin who performed administrative duties including payroll,

_____

[3] Subsequent to the vessel's loss, the web site was taken down

ordering supplies, scheduling, and employee promotion.  During the tragic voyage of BOUNTY, she took on the responsibility of collecting, providing and opining on vital weather information to Captain Walbridge all without professional maritime knowledge or experience.

14.      HANSEN hired Robin Walbridge as master of the BOUNTY soon after her purchase. Walbridge held this position until his death and at all relevant times, acted as the owner's representative, reporting directly to HANSEN on all matters pertaining to the seaworthiness and operation of BOUNTY.

15.      At all relevant times, BOUNTY was documented by the USCG as a "moored attraction vessel".  The USCG Inspection and Certification Procedures for Moored Attraction Vessels, are set for in the USCG Marine Safety Manual, Vol. II: SECTION B: Chapter 4.  The USCG defines an "attraction vessel" as a vessel that is put on public display or used as a platform for a public exhibit and carrying passengers only while temporarily moored to a dock. BOUNTY was never certificated as safe to carry passengers for hire on a voyage of any description including harbor day sails.  The USCG considered BOUNTY safe for public use in one instance alone, when she was securely moored to a pier.

16.      During the period BOUNTY was owned by HANSEN and BOUNTY ORGANIZATION,  she was drydocked at various times at the Boothbay Harbor Ship yard, the most recent was during September 17 to October 20TH 2012,  (hereinafter "2012 drydocking")

17.      Todd Kosakowski ("Kosakowski") was Boothbay's project manager in charge of the 2012 drydocking.

18.      During the course of the 2012 drydocking, Kosakowski discovered extensive deterioration and rotting of frames and planking on both sides of the vessel and also in a portion of the vessel's stern.

4

19.     Kosakowski advised Captain Walbridge of the condition and recounted Walbridge's reaction as *"shock which turned into awe"* when he saw the extent of the condition revealed by the limited number of planks that had been removed.[4]

20.     In such circumstances, proper shipyard repair procedures and common sense dictate that additional steps be taken, including but not limited to, removal of additional planking and testing to determine the full extent of the deterioration, to allow a proper repair plan to insure the vessel's seaworthiness.

21.  Captain Walbridge advised HANSEN as to the extent of the rot and deterioration discovered, the scope of procedures to ascertain the full extent of the condition, and the magnitude of the necessary repairs.  Captain Walbridge also recommended that HANSEN sell BOUNTY as soon as possible.

22.  HANSEN, BOUNTY ORGANIZATION and Captain Walbridge decided neither to proceed with the aforesaid proper procedures nor to advise the Coast Guard.  Instead repairs were performed on the limited areas where planking had been removed.

23.     Kosakowski did not notify the Coast Guard regarding the unseaworthy condition. Neither did he advise anyone as to the decision of Captain Walbridge, HANSEN, and BOUNTY ORGANIZATION not to undertake proper repairs. Kosakowski did however memorialize the incident. He took photographs of rotted sections, he preserved  wood remnants and he documented conversations between himself and Captain Walbridge which were provided to Coast Guard investigators subsequent to BOUNTY'S loss.  In addition, Kosakowski, strenuously urged that Walbridge advise HANSEN and BOUNTY ORGAINIZATION not to sail BOUNTY in any significant or heavy weather conditions.

---

[4] A joint NTSB/CG hearing into the sinking of HMS BOUNTY was held Feb. 12th to Feb 21st 2012.  Kosakowski testified as a witness.

24.     Captain Walbridge advised HANSEN as to all matters discussed with Kosakowski including the warning that BOUNTY not sail in heavy weather.

25.      Subsequent to BOUNTY'S loss, an analysis of the wood remnant performed by a Coast Guard expert determined the condition of rot within the BOUNTY was extensive and undermined her strength and seaworthiness.

26.     The 2012 drydocking repairs included caulking of plank seams. The vast majority of this work was performed by inexperienced seamen employees of BOUNTY ORGANIZATION using unsuitable non-marine grade caulking materials purchased at Home Depot; identified as Dap 33 (window glazing) and NP1[5]. Only a few planks were caulked by experienced Boothbay shipyard personnel.

27.     During the 2012 drydocking while the vessel was resting on her blocks, her keel was noted to be in a permanent condition of "hog".  "Hog" is defined as a permanent deformation of the keel and hull causing excessive compression stresses in the mid length portion of the vessel.

28.     During the 2012 drydocking a USCG issued "stability letter" was in effect which prohibited the addition or removal of ballast of any kind and required that any modification to the vessel that might change the vessel's weight be reported to the USCG. The stability letter further prohibited shifting of BOUNTY's ballast.  BOUNTY ORGANIZATION, HANSEN and Captain Walbridge knowingly violated the terms and conditions of the Stability Letter by ordering crewmembers to manually move approximately 5,000 to 6000 lbs of lead ballast, in violation of the Stability Letter, to an aft location without USCG notification or approval and without consulting a naval architect.  The ballast consisted of rectangular bars,

---

[5] NP1 is a construction polyurethane caulking, that BOUNTY was "experimenting "with during the 2012 dry dock. It was used on one side of the BOUNTY and Dap 33 on the other.

approximately 35 lbs each, which were placed in the "lazarette" to its full capacity with the overflow stored in the engine room bilges.  No provisions were taken to secure the ballast.

29.     During the 2012 drydocking several water tanks were converted for use as fuel tanks.  In addition, two new 900 gallon tanks were installed for carriage of fuel and two new 900 gallon tanks were installed for water. The total new capacity of fuel and water approximated six tons and were located aft of the longitudinal center of the ship.  The relocation of the tanks was in violation of the Stability Letter and performed with the knowledge of BOUNTY ORGANIZATION, HANSEN and Captain Walbridge.

30.     The aforesaid relocation and placement of unsecured ballast and other weights in the stern caused additional and excessive stresses which compromised the watertight integrity of the hull, and aggravated the pre-existing hogging stresses.  These factors in combination with the unavoidable shifting, movement and slamming of unsecured weights during rolling and pitching in heavy seas, created the potential and likelihood that framing and seams would come apart as the vessel's hull "worked" in a seaway, allowing flooding, which in point of fact occurred during the ill-fated voyage.

31.     During 2012 drydocking BOUNTY'S main fuel tanks were removed because of rust and decay. Prior to removal, oil existing in the tanks, included rust contaminants, were transferred -without filtering - to the day tanks in the engine spaces. This created the potential and likelihood that BOUNTY'S main engine filters would be overloaded particularly in heavy seas due to agitation of rust contaminant. During the encounter with SANDY, fuel filters had to be changed numerous times causing excessive down time of engines and generators. Compounding the aforesaid fuel oil problems, was the fact that Tracie Simonin had outfitted BOUNTY with the incorrect filters for one of the generators.

32.     BOUNTY departed Boothbay Shipyard on October 20, 2012 bound for New London, Connecticut.  Her itinerary called for a brief stay at New London followed by a more extensive stay in St. Petersburg, Florida during November 8th to 11th for a fund raising event to be co-sponsored with the Ashley Deramus Foundation.[6]

33.     On information and belief, a review of the financial records of BOUNTY ORGANIZATION prior to the ill-fated voyage would show numerous instances in which wages were owed to crewmembers, and that the vessel was lacking in proper provisions, supplies, necessaries, gear and equipment, and that the BOUNTY ORGANIZATION was typically if not continuously in debt.  The one ray of hope which appeared on the horizon which offered a potential respite from the financial difficulties was an affiliation and or partnership between BOUNTY ORGANIZATION and the Ashley DeRamus Foundation.

34.     It was public knowledge that Walbridge, HANSEN and BOUNTY ORGANIZATION, hoped and believed that a newly launched partnership with the Ashley DeRamus Foundation would breathe financial life into the BOUNTY ORGANIZATION while simultaneously providing a floating platform to publicize children with disabilities. The expectations for BOUNTY'S arrival at St. Petersburg were high and many families were scheduled to attend, as seen by this statement from Connie DeRamus:

" We were all so excited about the future of Bounty, and the new relationship was to kick off with a grand welcome in St. Petersburg, Fla. Around November 9th … the Down syndrome organizations of Tampa Bay and St. Petersburg were arranging to have families there to greet the ship and celebrate the start of a new chapter for the Bounty." [7]

---

[6] The Ashley Deramus Foundation was founded for and dedicated to the education, advancement and quality life-style of children and adults with Downs Syndrome.

[7] Reported in "Questions Abound About Bounty's Final Journey" by Beverly Ware of South Shore Bureau.

### BOUNTY DEPARTS BOOTHBAY TOTALLY UNSEAWORTHY

35.     At that time BOUNTY departed Boothbay Shipyard, numerous items of work was uncompleted, or never performed such as the failure to clean bilges of debris, the failure to weatherproof electrical panels and electrical controls boxes, the failure to inspect and overhaul bilge system, including back-up pumps, the failure to secure lead ballast, the failure to install proper electronic communication and weather reporting equipment, and other necessary work to make her seaworthy and in other particulars which will be presented during trial.  All of the foregoing occurred with the knowledge of Captain Walbridge, HANSEN and BOUNTY ORGANIZATION.

36. BOUNTY's bilge system consisted of two electric pumps of 150 gal/min capacity and two hydraulic backup pumps. The hydraulic pumps were mechanically actuated by a "power take off" on the starboard main propulsion engine.  One hydraulic pump was fixed to the bilge manifold the other was portable in the engine room.  In addition to these four pumps, the vessel also had a portable gasoline powered pump stored outside the engine spaces, commonly known as a "trash pump".  The capacities of these pumps were in order of magnitude similar to basement sump pumps typically purchased at Home Depot for residential use.   In addition, the capacities of BOUNTY's pumps were compromised because the piping size of the bilge manifold was improperly sized smaller than the discharge size of the pumps.

37.     On the voyage from Boothbay to New London, and while in New London, a number of crewmembers including Doug Faunt, Adam Prokosh, Drew Salapatek and Matthew Sanders noted that the electric bilge pumps were not priming and pumping properly and that discharge pressures of the pumps were lower than normal during wash-down of the main decks. Captain Walbridge observed firsthand these deficiencies in the engine spaces but took no

corrective action or repairs.  The same problem was brought to Captain Walbridge's attention a

second time when the crew were performing wash down of the main decks.  Captain Walbridge

again took no action or repairs. 46 CFR 4.05-1 requires the USCG be notified of any occurrence

materially and adversely affecting the vessel's seaworthiness or fitness for service or route,

including not limited to failure of various items of equipment including bilge pumping systems.

The obligation is imposed on the owner, agent, master operator or person in charge.  Neither

Walbridge, HANSEN or BOUNTY ORGANIZATION complied with this obligation.[8]

### THE DECISION TO SAIL INTO HURRICANE SANDY

38.      On October 25th, at about 16:00 hrs (4-pm) Captain Walbridge called the

entire crew to a meeting on the main deck.  He stated that because SANDY was coming up the

East Coast,  he had decided to depart for St. Petersburg within two hours. He assured the crew

that based on his extensive experiences with hurricanes and BOUNTY, that all would be safe and

that the vessel was in fact safer at sea than in port.   Walbridge also discussed his sailing plan

which was to proceed East to get outside of the storm. [9]

39.      Captain Walbridge, did not reveal to the crew that just prior to this meeting,

he had initially revealed his plan to Chief Mate John Svendsen, his most senior officer. Svendsen

unsuccessfully argued against it because of the obvious extreme dangers and the availability of

---

[8] **46 CFR 4.05-1: Notice of marine casualty.**
(a) Immediately after the addressing of resultant safety concerns, the owner, agent, master, operator, or person in charge, shall notify the nearest Marine Safety Office, Marine Inspection Office or Coast Guard Group Office whenever a vessel is involved in a marine casualty consisting in--
(4) An occurrence materially and adversely affecting the vessel's seaworthiness or fitness for service or route, including but not limited to fire, flooding, or failure of or damage to fixed fire-extinguishing systems, lifesaving equipment, auxiliary power-generating equipment, or bilge-pumping systems;

[9] As the facts unfolded, it became clear, that was the extent of the "plan"  the remainder would be decided later depending on the SANDY's movements.

safe harbors to ride out the storm.  Svendsen, although present at the crew meeting, remained silent.

40.     Not only was the decision to go to sea with this wooden boat – originally built as a movie prop – reckless, but so too was the two hour notice given to the crew.  There was no time to allow them to grasp the full implications of the storm, or to confer with family, friends or knowledgeable individuals. Nonetheless, and because the entire crew- excepting Mate Svendsen - trusted Walbridge implicitly– all agreed to make the voyage.  The crew, for the most part,  lacked adequate experience to comprehend the perils of the seas that awaited as seen in **Exhs. 2, 3 & 4**  which show their maritime experiences:

   a.     Ten crewmembers (63%) had been aboard Bounty for less than 8 months,
   b.     Six of those had never been aboard any other tall ship -including 3rd mate Cleveland.
   c.     2nd mate Sanders had one summer's experience as a summer intern, and no other tall ship experience.
   d.     Nine crewmembers had never sailed on another tall ship.
   e.     The engineer, Barksdale, had a total of 4 days sea time on Bounty and had no experience or training whatsoever on marine diesel engines or generators.
   f.     The average total tall-ship experience for a deckhand was 1 year. The average Bounty experience for a deckhand was six months.

41.     Captain Walbridge, who was focused on the rewards lying at St. Petersburg, recklessly ignored SANDY'S size, scope and intensity. He also grossly overestimated, to the point of recklessness, BOUNTY'S seaworthiness and overestimated his professional seamanship and weather forecasting abilities to the point of arrogant hubris.

42.     On October 25th,  approximately 50 "Tall Ships" were in various ports along the East coast.  All faced the question as to what should be done to protect their vessels and crew from SANDY.  Not one decided to leave the safety of their ports.

43.     SANDY was classified as a tropical depression early on October 22nd and upgraded that same day to a "Tropical Storm". Early on October 24, the National Hurricane Center (NHC) upgraded her to hurricane status named "SANDY". She soon was publicized as the greatest storm of the century - a *"Frankenstorm"*

44.     Notwithstanding the extensive news and media coverage devoted to SANDY and warnings provided by the NHC and Marine Advisories, neither HANSON nor BOUNTY ORGANIZATION countermanded Walbridge's reckless sailing plan. More importantly, HANSON and BOUNTY ORGANIZATON were on notice that Walbridge had made bizarre public statements in a video interview which aired on television which directly pointed not only to his lack of competence but to the threat he presented as master of BOUNTY.[10] During this interview, which was made aboard BOUNTY, Walbridge totally dismissed the dangers of hurricanes and bad weather, stating" *"there is no such thing as bad weather only different kinds of weather"*. He also compared a hurricane as something similar to a thrilling amusement ride; *" we chase hurricanes" …. "you get a good ride out of it"*. Notwithstanding the "red flags" and clear import of his opinions, HANSEN and BOUNTY ORGANIZATION failed to remove Walbridge as master. Neither did they take any steps to investigate the incident. Moreover, during the ill-fated voyage, emails and messages sent by Walbridge, describing BOUNTY's rapidly deteriorating condition as she encountered hurricane SANDY, showed that Walbridge continued to be mentally detached from reality.

45.     On Oct. 25th at approximately 1800 hours (6:00 pm), BOUNTY sailed out of New London with the consent of HANSEN and BOUNTY ORGANIZATION on a voyage she could never survive. Her master was dangerously incompetent, her crew were severely untrained, her primary pumps were in need of repairs; her bilges contained debris which

---

[10] The interview was aired on Belfast Maine Community TV in August 2012 and subsequently posted on You-tube

continuously clogged strainers;  her hydraulic backup and portable trash pumps were

inoperative and had not been tested or operated in years; her day fuel tanks were contaminated,

her generator fuel filters were the wrong size, her plank seams were caulked with home depot

window glazing materials; her framing was rotted to an extent and degree which was unknown;

her keel was overloaded due to hogging stresses aggravated by placement aft of  tons of

unsecured lead ballast, fuel and water tanks;  and abandon ship drills had not been conducted

since mid September 2012.   In short, the combination of BOUNTY going to meet

*FRANKENSTORM SANDY* was the greatest mismatch between a  "vessel" and a peril of the

sea that would ever occur or could ever be imagined.

     46.     On Oct. 26th Captain Walbridge sent three emails which clearly demonstrated

he lacked a level of professional knowledge and experience which would even allow him to

appreciate the imminent danger awaiting BOUNTY and her crew.

At 12:54 pm he wrote the following:

..Sandy looks like a mean one. Right now we are on a converging course. I am actually headed to
the dangerous side of it. Hoping like a deer if I am at it, it won't be there when I get there.  …

At 12:54 pm Walbridge wrote;

> We are headed S x E waiting to see what the storm wants to do. I am guessing it wants
> to come ashore in NJ / NYC. We are running trying to stay on the east side of it. Bad
> side of it until we get some sea room. If we guess wrong we can run towards
> Newfoundland. If it turns and wants to tangle with us that means it is pretty far off shore
> and we can turn and go down the west side of it.  I need to be sure it is well off shore
> before we can take advantage of the good weather for us. Right now I do not want to get
> between a hurricane and a hard spot. If you can send us updated track info (where it is
> projected to go) that would be great. We know where it is, I have to guess (along with
> the weather man) where it is going. [11]

At 22:21 (10:21pm) Walbridge wrote:

---

[11] This was sent to Hansen and Simonin  at rhansen@islandaire.com and Tsimoin@tallshipbounty.org

> We are still heading towards the storm and waiting for it to make up its mind as where it wants to go. I am hoping it head a little further out to sea so we can sneak down the west side of it. Otherwise we will be heading to Newfoundland.[12]

47.     On Oct. 26th, 22:36 (10:36pm) Tracie Simonin, possessing neither knowledge nor experience now took on the primary role of providing and attempting to analyze weather information. Her email to Walbridge reads:

> I will keep sending updates as I see them. From what I can tell it will make landfall in NJ heading North and then will swing west when it reaches NJ.  Keep sending me updates on all of you so I don't have to worry about you all weekend.

48.     **Exh. 5** shows the track-lines of BOUNTY, SANDY and the Coast Guard rescue team.   As shown on October 27th, two days into the voyage, BOUNTY changed course from southeast and southwest. This occurred at 11:00 am. She was now on a collision course with SANDY.

49.   On October 27th,  08:00 ,  seas were 8-10 feet and winds were 20 kts. As the day progressed, BOUNTY'S unseaworthiness began to manifest.  At noon, Chris Barksdale, the only engineer aboard, was hurled across the deck injuring his right hand. By 16:00 (4:00pm) sea water was rising in the bilges faster than it could be pumped overboard.  At 19:00 (7:00pm) seas were 15 feet and winds 30-40 kts. Walbridge ordered the hydraulic pumps to be put into operation. They were found to be inoperative due to corrosion and lack of maintenance. By 20:00 (8:00pm) crewmembers were needed constantly in the engine room to operate the bilge pumps. Violent rolling of the vessel caused the pumps to lose suction and prime and debris in the bilges caused clogging of strainers. Walbridge and other crewmembers attempted repairs of the back-up hydraulic pumps.   At that point in time, it was clear that BOUNTY was taking on water faster than her deficient pumps could handle.  She was flooding.  Despite these events, Walbridge did

---

[12] Also sent to Hansen and Simoin at  rhansen@islandaire.com and Tsimoin@tallshipbounty.org

not send out a "Mayday" or a "Pan Pan".[13]  Nor did Walbridge, HANSEN or BOUNTY

ORGANIZATION  notify the USCG as required by 46 CFR 4.05-1.

     50.   On October 28th, at 07:00  BOUNTY was in 25 ft seas and 50 kt. winds.

BOUNTY experienced material failures and deficiencies of equipment continuously throughout

the day.  The portable hydraulic pump proved not portable because its flexible hosing had been

pinned to the bulkhead by a modification made by the crew after the system was originally

installed.    Crewmembers reported being shocked because the electric system had not been

properly weatherproofed. At 09:00  smoke was noted coming out of the galley stove.   At 11:30

a broken sight glass on a fuel oil day tank caused the port engine and port generator to shut

down.  At noon the water level was twice normal in the engine room. At 13:00 (1:00pm) the

galley table was ripped off its hinges.  At 14:00 (2:00pm) the fore course sail ripped in half.

Engineer Barksdale reported to Walbridge and Chief Mate Svendsen that water was entering the

engine room from the waterline on the port side.  An inflatable boat broke loose from its

mountings. The bilge high water alarm had to be disabled because it was constantly sounding

off.   At 15:15 (3:15pm) the starboard generator was surging heavily causing electric power to

fluctuate, Walbridge ordered all non-vital electrical systems shut down.  At 15:45 (3:45pm) an

electrical fire occurred in the galley.

     51. On Oct 28th at 15:45 (3:45 pm) Captain Walbridge was injured when a vessel roll

hurled him into a table in the great cabin room.   15:50 (3:50 pm), Chief Mate Svendsen urged

Walbridge, "We should call the Coast Guard"  - Walbridge declined, again violating 46 CFR

---

[13]A "pan-pan" informs potential rescuers (including emergency services and other craft in the area) that a safety problem exists whereas "Mayday" will call upon them to drop all other activities and immediately initiate a rescue attempt.

4.05-1.  Neither did he send a "Pan Pan" or "Mayday".  At 16:00 (4:00 pm) a massive following sea smashed the windows on the aft great cabin. Walbridge was heard to have stated "we are losing the battle of the bilge."  Sea water was seen entering from the aft end of the lazarette. Walbridge "hoved  to" on a port tack in an attempt to keep the bilge suction strainers from sucking air and loosing prime.  The starboard generator shut down twice as Barksdale replaced clogged fuel filters. At 16:30 (4:30pm) Walbridge, the 2nd mate and Barksdale were in the engine room taking apart a clogged pump impeller and attempting to rebuild a portable hydraulic pump.[14]  At 17:00 (5:00pm) kitchen utensils were being used to scoop debris from water sloshing in the bilges.   The starboard generator was shut down to remove and replace clogged fuel filters. At 17:30 (5:30pm) the fore course blew out of its furl sending three crewmembers aloft to secure it.   At 17:45(5:45pm) the spanker gaff [15] broke apart.  At 18:00 (6:00 pm) Chief Mate Svendsen again attempted to bring Walbridge back to reality:  "Captain -  We are in Distress".  Again, the warning was ignored.  At 18:30 (6:30pm) the anemometer registered 90 kt. winds.  A massive wave next struck the vessel hurling Crewman Prokosh 15-20 ft. against a bulkhead causing multiple rib fractures, a dislocated shoulder and multiple vertebrae fractures.  His injury clearly required professional medical treatment.  Common sense and 46 CFR 405-1 (6) required the Coast Guard be notified.  At 18:50 (6:50 pm) the inflatable boat broke free and was pinned against the rigging.  At 19:15 (7:15pm) crewmembers attempted to shore up the Great Cabin windows to minimize shipping of seas.  At 19:30 (7:30pm) crewman Faunt attempted to work the high frequency radio  and INMARSAT satellite phone, only to find they did not function.  At 20:00 (8 pm) the starboard generator shut down. BOUNTY was now without power, without lights and without any dewatering ability. Crewmember Sprague was sent to collect life jackets

---

[14] The presence of the master and a 2nd office in the engine room doing pump repairs, instead of attending to navigation, is one of a long list of events underscoring the inadequacy of manning levels and skills.
[15] Spanker gaff is a wooden timber that secures the top of one of the vessel's sails.

16

and emergency supplies for possible abandon ship. Barksdale attempted to utilize the gas

powered trash pump. It has not been used in years and all efforts to get it working failed.

52.   On Oct. 28th at approximately 21:00 (9:00 pm) Captain Walbridge finally and for

the first time sent a message which would qualify as a "Pan-Pan" except it was sent not to the

Coast Guard, but to BOUNTY ORGANIZATION.  In it he stated:

> We are taking on water. Will probably need assistance in the morning. Sat phone is
> not working very good. We have activated the EPIRP. We are not in danger tonight,
> but if conditions don't improve on the boat we will be in danger tomorrow. We can
> only run the generator for a short time.. I just found out the fuel oil filters you got
> were the wrong filters. Let me know when you have contacted the USCG so we can
> shut the EPRIB off.  The boat is doing great but we can't dewater.  (emphasis added)

53.       On receipt of that message BOUNTY ORGANIZATION did not forward

the message; instead Tracie Simonin called the USCG by telephone. The USCG reported her

communication as follows;

> OWNER OF VSL RPTS HE RCVD EMAIL FM VSL BOUNTY REPORTING: NO
> DANGER TONIGHT. VSL ON GENERATOR POWER THROUGH MORNING.
> NOT ABLE TO DEWATER ATT. IF SITUATION WORSENS THE COULD BE
> IN POSSIBLE DANGER . SHOULD BE OK THROUGH TOMORROW. VLS
> REPORTED TO BE IN SEAWORTHY CONDITIOIN. ATT. IF WX
> CONDITIONS DO NOT SUBSIDE VSL BOUNTHY WILL NEED ASSISTANCE
> TOMORROW.

54.   On Oct. 28th at 22:55 (10:55 pm) Captain Walbridge sent the USCG the

following email:

> We are 34-07 N x 074-08 W,  course 130 speed 2.6 kts 17 people on board.  I do not
> know how long I will be able to receive email. My first guess was that we had until
> morning before have to abandon seeing the water rise I am not sure we have that
> long. We have two inflatable rafts. We have activated our EPIRP.   Robin HMS
> Bounty

17

55.   Oct. 29 at approximately 00:15 (12:15am) Chief Mate Svendsen ordered the crew to take seasickness medications. All safety gear, immersion suits, life jackets, emergency ditch kits were ordered to be located and lined up in the mizzen area by the great cabin. Preparations were made to abandon ship.

56.   Oct. 29th at 01:12, Oct. 29th BOUNTY reported to the Coast Guard that she was taking on 2 feet of water per hour, and was advised by Coast Guard that the nearest rescue vessel was 8 hours away.[16]

57.   Oct. 29th at about 03:00 the crew was assembled in the great room outfitted in their emersion suits. Walbridge was present. He asked the crew  *" What went wrong? At what point did we lose control?*

58.   Oct. 29th at  O3:25  Chief Mate Svendsen advised Captain Walbridge that they should abandon ship immediately. Walbridge declined.  Had Walbridge consented, the subsequent problems of crew entanglement with Bounty's rigging which occurred when she went over 90 degrees would have been avoided. Moreover the crew would have abandoned ship in an orderly manner without being hurled or forced to jump.

59.   Oct. 29th at 03:30 sea water entered into the tween deck level which was one level below the main deck.

60.   Oct. 29th at 03:41 Walbridge sent the following communication to the Coast Guard:

> We have lost all dewatering abilities. Estimate 6 to 10 hours left. When we lose all power we lose email – there should be an EPRIB going off –water is taking on fast- we are in distress – <u>ship is fine, we can't dewater- need pumps</u>.  (emphasis added)

---

[16]  The 2ft/hr estimate was a gross underestimate. .

61.  Oct. 29th at 04:28  Chief Mate Svendsen again requested Walbridge to abandon ship.  Again he replied - "No".

62.  Oct. 29th  04:30  Chief Mate Svendsen repeated the request a third time; Walbridge finally agreed, but it was too late. Within minutes, BOUNTY capsized 90 degrees onto her port side.  The entire crew who were now huddled in small groups on the main deck were either hurled or forced to jump into the black seas.

63.   Prior to the vessel capsizing, Claudene was seen by numerous crewmembers on deck properly outfitted in her immersion suit and uninjured.

64.  Oct. 29th at 05:41 the first USCG helicopter arrived on the scene.  Between  6:30 to 8:00 fourteen surviving crewmembers were retrieved from life rafts and hoisted aboard the helicopters.

65.  Claudene was not among the survivors, she had drifted away from the life rafts.

66.  Oct. 29th  at approximately 16:38 (4:38pm),   Claudene's body was found floating in her immersion suit. She was lifted into the helicopter.  CPR was commenced, but vital signs were not restored. She was next taken to Albermarle Hospital, Elizabeth City and pronounced dead at 7:00 pm.

**Pre-Death Conscious Pain and Suffering**

67.  On October 27th, at about 11:00 am,  Walbridge realized his initial plan was doomed because SANDY's unbelievable size which covered most of the Atlantic Ocean left no safe options.   He changed course to SW in an attempt to get between SANDY and the east coast. To do so  meant bringing BOUNTY about onto a collision course towards SANDY.  Once the crew was advised as to the course change, Claudene, as did all, realized they were in a perilous situation and that their confidence and trust in Walbridge was sadly mislaid.  As the events of

Oct 27th - 28th unfolded until the vessel capsized, Claudene was aware of each and every deficiency, equipment failure, setback, difficulty,  crew injury, and incremental increase of flooding as BOUNTY'S seams and planks progressively opened.  She suffered and endured fear, fright, anxiety and mental pain and suffering while still hoping that BOUNTY would make it to a safe harbor.  As time went on, hope diminished and her mental pain and suffering increased to another level as she ministered and comforted Adam Prokosh, who was severely injured without hope of medical treatment.  Her mental pain and suffering again increased when the crew were ordered to don immersion suits and report to the main deck as the vessel was rolling 35-45 degrees in near total blackness at 4:30 . Her mental pain and suffering increased to still another level, when BOUNTY suddenly capsized either tossing her or causing her to jump into the seas. Once in the water and realizing she was drifting not towards the safety the life-rafts but away from her crewmates into darkness, her mental pain and suffering increased to levels beyond words as she floating in her immersion suit for hours in howling winds and 27 foot seas.

## FIRST CAUSE OF ACTION JONES ACT NEGLIGENCE AGAINST BOUNTY ORGANIZATION

68.   Plaintiff restates and realleges each and every allegation contained in paragraphs 1 to 67 with the same force and effect as though set forth in length.

69.   At all times relative hereto BOUNTY ORGANIZATION hired the crew of the BOUNTY.

70.   At all times relative hereto Claudene was employed by BOUNTY ORGANIZATION as a seaman.

71.   By reason of the foregoing allegations BOUNTY ORGANIZATION by and though its officers, agents and servants including Captain Walbridge, committed acts of negligence, gross negligence, willful, callous and reckless conduct the following respects;

a.   Continuously failing to provide proper supplies, gear, equipment, provisions and necessaries to insure BOUNTY was in a seaworthy condition.

b.   Ignoring unmistakable evidence of rot and deterioration existing at the 2012 dry-docking, and the clear adverse consequences of concealment rather than proper corrective repairs.

c.   Ignoring the warnings of project manager Kosakowski that BOUNTY not be sailed in heavy weather.

d.   Ignoring the repeated warnings of crewmembers between departure from Boothbay to departure from New London, that the bilge pumping system was deficient and the most likely cause was the failure to have cleaned debris in the bilges from the yard work.

e.   Ignoring the warnings of National Hurricane Center, Marine Advisories, news and other media ("public warnings") as to the approach of the largest Hurricane in the century and taking BOUNTY to sea.

f.   Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY contrary to the "moored attraction" limitations imposed in her USCG certificate.

g.   Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel known to have a deficient and inadequate bilge pumping system which was further compromised by debris in the bilges, and whose back-up hydraulic and gasoline powered pumps had not been operated, tested or overhauled in years.

h.   Allowing BOUNTY  to proceed to sea contrary to public warnings about SANDY with a voyage plan that intentionally violated the fundamental principles of hurricane avoidance (i.e. the 1-2-3 Rule) and which violated the mandate Never to Cross the "T".

i.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY without the resources and radio electronic equipment which would have allowed the application of the aforesaid rules for hurricane avoidance.

j.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with an untrained, unprepared and inadequate size crew of "green seamen" who were not trained in abandoned ship procedures.

k.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel whose framing and planking was known to be rotted and deteriorated, the full extent of which was undetermined.

l.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel known to have incorrect fuel oil filters and with a vessel whose day tanks contained unfiltered and contaminated fuel oil.

m.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel whose planking was caulked with cheap non-marine materials and who caulking was largely performed by non- professional caulking personnel.

n.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel lacking proper electronic communication and weather receiving equipment and whose satellite phone and high frequency radios were not tested.

o.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel which was modified in violation of her Stability Letter by the placement of excessive and unsecured lead weights and liquid tanks to an aft position thereby warranting imposition of the Pennsylvania Rule.

p.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel whose master was manifestly incompetent by reason of having made bizarre public statements trivializing the most dangerous of sea perils – hurricanes and failing to conduct an inquiry to determine his fitness for command.

q.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a vessel whose master lacked basic rudimentary knowledge as to weather forecasting, meteorology, oceanography, hurricane tracking, and hurricane avoidance.

r.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY with a shore side support staff unknowledgeable in weather forecasting,

meteorology, oceanography, hurricane tracking, and hurricane avoidance and who took on the responsibility of provided and interpreting vital information about SANDY.

s.  Allowing BOUNTY to proceed to sea contrary to public warnings about SANDY without a competent shore side staff of professional maritime personnel capable of providing 24/7 support for weather forecasting, meteorology, oceanography, hurricane tracking, and hurricane avoidance.

t.  Following departure New London, ignoring continued and upgraded public warnings and information as to SANDY's movements which made absolutely clear that BOUNTY should abort and return to the nearest safe port.

u.  Failing to report to the Coast Guard that irrational and contradictory communications received from Captain Walbridge indicated he was acting in a manner which was detached from reality, highly reckless and likely to cause the destruction of BOUNTY and loss of her crew.

v.  Failing to send "Pan-Pan and Mayday messages directly to the Coast Guard in a timely manner when her unseaworthiness from flooding was obvious.  At the outset, such messages should have been sent at least 30 hours prior to her capsizing.

w.  Failing to send "Pan Pan" and Mayday messages on the occasion of each of the approximate 25 instances of equipment failures, breakdowns, material failures, fires, electrical shorts, power outages, shuts downs, and crewmember injuries cited in paragraphs 50 and 51.

x.  Failing to contact the Coast Guard as required by 46 CFR 4.05: at each occurrence in which BOUNTY'S bilge pumps manifested deficient, commencing with departure from Boothbay Shipyard and thereafter.

y.  Failing to contact the  Coast Guard as required by 46 CFR 4.05: at each occurrence materially and adversely affecting BOUNTY's seaworthiness or fitness for service or route including failure of lifesaving equipment, auxiliary power-generating equipment or bilge systems.

z.  Failing to contact the  Coast Guard as required by 46 CFR 4.05: at each occurrence of a serious crewmember injury.

aa.  Hampering Coast Guard Rescue efforts by sending or causing to be sent erroneous, misleading and confusing communications stating BOUNTY was

"seaworthy", "not in danger", "doing great" "ship is doing fine" when in fact BOUNTY was coming apart, progressively flooding, and in extreme imminent danger.

bb. Failing to abandon ship in a timely manner prior to capsizing.

cc. Intentionally placing the lives of the crew at extreme risk for the sole purpose of financial gain.

72.   The aforesaid acts of negligence, gross negligence, willful, callous and reckless conduct were a direct and substantial cause of Decedent Claudene's death.

73.   As a result of the wrongful death of Decedent, Plaintiff incurred pecuniary losses including funeral expenses.

74.   Plaintiff also brings a survival cause of action on behalf of Decedent's estate for Claudene's pre-death conscious pain and suffering, fear and freight of pending death in the amount of TWENTY MILLION ($20,000,000.00) DOLLARS.

**SECOND CAUSE OF ACTION UNSEAWORTHINESS AGAINST BOUNTY ORGANIZATION**

75.   Plaintiff restates and realleges each and every allegation contained  paragraphs 1 to 74  with the same force and effect as though set forth in length

76.   The acts of negligence, gross negligence, willful, callous and reckless conduct and conditions, lack of procedures, improper procedures and improper methods stated above rendered BOUNTY UNSEAWORTHY.

77.   The unseaworthy conditions set forth in the complaint were a direct and substantial cause in decedent's death.

78.   As a result of, the wrongful death of Claudene, Plaintiff incurred pecuniary losses including funeral expenses.

79.   Plaintiff also brings a survival cause of action on behalf of Decedent's estate for Decedent's pre-death conscious pain and suffering, fear and freight of pending death in the amount of  TWENTY MILLION ($20,000,000.00) DOLLARS.

## THIRD CAUSE OF NEGLIGENCE AGAINST HANSEN

80.   Plaintiff restates and realleges each and every allegation contained paragraphs 1 to 79  with the same force and effect as though set forth in length.

81.   HANSEN was the corporate officer who was in charge of the vessels operation and had ultimate authority as to the operation and maintenance of the BOUNTY.

82.   Captain Walbridge, as the owner's representative, was in regular communications with HANSEN advising him of vessel operations, maintenance, repairs, itinerary and anticipated weather.

83.   HANSEN was ultimately responsible to make sure the vessel was seaworthy, properly maintained, properly crewed and operated, yet continuously failed to take fulfill that responsibility.

84.   HANSEN has actual knowledge and condoned each and every act of negligence, gross negligence, willful, callous and reckless conduct and conditions, lack of procedures, improper procedures and improper methods stated above.

85.   HANSEN's acts as set forth in the complaint were a direct and substantial cause of  Claudene's death.

86.   As a result of, the wrongful death of Decedent, Plaintiff incurred pecuniary losses including funeral expenses.

87.   Plaintiff also brings a survival cause of action on behalf of Decedent's estate for Decedent's pre-death conscious pain and suffering, fear and freight of pending death in the amount of TWENTY MILLION ($20,000,000.00) DOLLARS

## FOURTH CAUSE OF ACTION UNDER DOHSA AGAINST BOUNTY ORGANIZATION AND HANSEN

88.   Plaintiff restates and realleges each and every allegation contained paragraphs 1 to 87 with the same force and effect as though set forth in length.

89.   The wrongful acts of  negligence, gross negligence, willful, callous and reckless conduct and conditions, lack of procedures, improper procedures and improper methods stated as set forth in this complaint caused the BOUNTY to sink more than one marine league from the shores of any state or territory of the United States and were the direct and substantial cause of Claudene's death.

90.   As a result of, the wrongful death of Claudene, Plaintiff incurred pecuniary losses including funeral expenses.

91.   Plaintiff also brings a survival cause of action on behalf of Decedent's estate for Claudene's pre-death conscious pain and suffering, fear and freight of pending death in the amount of TWENTY MILLION ($20,000,000.00) DOLLARS.

## FIFTH CAUSE OF ACTION FOR PUNITIVE DAMAGES BOUNTY ORGANIZATION AND HANSEN

92.   Plaintiff restates and realleges each and every allegation contained paragraphs 1 to 91  with the same force and effect as though set forth in length.

93.   HANSEN and BOUNTY ORGANIZATION acts and omissions were willful,

callous, and recklessness of the highest degree as set forth in detail in this complaint.

94.   Claudene lost her life as the direct result of HANSEN and BOUNTY ORGANIZATION'S willful, callous and reckless conduct.

95.    HANSEN and BOUNTY ORGANIZATION are liable for punitive damages as a result  of such willful, callous and reckless conduct as recognized in *In re Merry Shipping* 650 F.2d. 622 (5th Cir. 1981) and  *Atlantic Soundings Co. v Townsend* 557 U.S. 404 (2009).

96.   Plaintiff demands punitive damages in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS.

**WHEREFORE**, Plaintiff prays that judgment be entered as follows:

a. Against BOUNTY ORGANIZATION on the First and Second Causes of Action in the amount of  TWENTY MILLION ($20,000,000.00) DOLLARS;

b.   Against BOUNTY ORGANIZATION and HANSEN jointly and severally on the Third and Forth causes of action in the amount of  TWENTY MILLION ($20,000,000.00) DOLLARS;

c.   Against  BOUNTY ORGANIZATION and HANSEN for punitive damages in the amount of FIFTY MILLION($50,000,000.00) DOLLARS on the Fifth cause of action;

d.   That Plaintiff be awarded costs, prejudgment and post judgment interest, and such other and further relief as justice may require.

Dated: May 6th, 2012

          TABAK, MELLUSI & SHISHA LLP
          Attorneys for Plaintiff

          *Ralph J Mellusi*

BY: _____
          RALPH J. MELLUSI (9680)
          JACOB SHISHA (5452)
          29 Broadway, Suite 2311
          New York, NY 10006
          (212) 962-1590

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

IN THE MATTER OF THE ESTATE OF )

 ) Case No. PB-2013- ll

CLAUDENE M. CHRISTIAN, Deceased. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 2 5 2013

VICKI BEATY, COURT CLERK

BY_____ DEPU

### ORDER FOR ISSUANCE OF LETTERS OF ADMINISTRATION, APPOINTMENT OF PERSONAL REPRESENTATIVE AND DETERMINATION OF HEIRSHIP

Now on this _25__ day of February, 2013, there comes on for hearing the Petition of Claudene Christian for Claudene Chrisitan to be Appointed as Personal Representative; Letters of Administration to be issued to Claudene Christian of the estate of Claudene M. Christian; and for judicial determination of heirs of Claudene M. Christian, Deceased. Claudene Christian appearing in person with the attorney for the Petitioner, J. Neal Rogers, and it being first proven that notice of this hearing has been given as required by law, both by publication and by mailing, and the Court having heard the allegations and proofs of said Claudene Christian and being fully advised in these premises:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Claudene Christian, be and she hereby is appointed Personal Representative of the estate of Claudene M. Christian, deceased, and that Letters of Administration issue to said Claudene Christian, Personal Representative immediately upon her taking the oath required by law.

Exhibit 1

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 0 1 2013

VICKI BEATY, COURT CLERK

BY_____ DEP

IN THE MATTER OF THE ESTATE OF )
) Case No. PB-2013- \\
) 
CLAUDENE M. CHRISTIAN, Deceased. )

## NOTICE OF HEARING PETITION FOR LETTERS ADMINISTRATION, APPOINTMENT OF PERSONAL REPRESENTATIVE AND DETERMINATION OF HEIRS

Notice is hereby given to all persons interested in the estate of Claudene M. Christian, deceased, that on the _1st_ day of February, 2013, Claudene Christian filed in the District Court of Sequoyah County, Oklahoma, her Petition praying that Letters of Administration be issued to Claudene Christian, that Claudene Christian be appointed as Personal Representative and that the heirs be determined.

Pursuant to an Order of this Court made on the _1st_ day of February, 2013, notice is hereby given that on the _21st_ day of February, 2013, at 10:00 a.m. the Petition will be heard at the District Court room in the County Courthouse, Sallisaw, Oklahoma when and where all persons interested may appear and contest the same.

In testimony whereof I have hereunto set my hand this _1st_ day of February, 2013.

_____
JUDGE OF THE DISTRICT COURT

J. Neal Rogers, P.C.
OBA #15339
Attorney At Law
208 North Wheeler Avenue
Sallisaw, Oklahoma 74955
(918) 776-9000

PUBLISH ONE TIME.

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

IN THE MATTER OF THE ESTATE OF          )
                                         ) Case No. PB-2013- 11
CLAUDENE M. CHRISTIAN, Deceased.         )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
FEB 2 5 2013
VICKI BEATY, COURT CLERK
BY_____ DEPUTY

### LETTERS TESTAMENTARY

Claudene Christian is hereby appointed Personal Representative of the Estate of Claudene M. Christian, Deceased, within the State of Oklahoma.

Witness, Judge of the District Court of Sequoyah County, Oklahoma, this 25 day of February, 2013.

_____
JUDGE OF THE DISTRICT COURT

### OATH OF PERSONAL REPRESENTATIVE

STATE OF OKLAHOMA          )
                           ) ss.
COUNTY OF SEQUOYAH         )

I, Claudene Christian, does solemnly swear that I will perform according to law the duties of Personal Representative of the Estate of Claudene M. Christian, deceased.

_____
Claudene Christian

Subscribed and sworn to before me, the undersigned Notary Public, this 25th day of February, 2013.

Notary Public _____

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the

following persons are the sole and only heirs of deceased:

| NAME AND AGE | RELATIONSHIP | ADDRESS |
|---|---|---|
| Claudene Christian<br>Adult | Mother | 454968 Highway #64<br>Vian, OK 74962 |
| Harry R. Christian<br>Adult | Father | 454968 Highway #64<br>Vian, OK 74962 |

**WITNESS MY HAND** the date first above written.

JUDGE OF THE DISTRICT COURT

Vicki Beaty, Court Clerk, for Sequoyah County
. . ., hereby certify that the foregoing is a true,
correct, and full copy of the instrument herewith set
out as appears of record in the Court Clerk's office
of Sequoyah County, Oklahoma, and said instrument
is now in full force and effect.
Dated this ____ day of _____
20 13.          Vicki Beaty, County Clerk
                By _____
                     Deputy



Exhibit 2



Exhibit 3

Total time on Bounty (approx) in years since reporting aboard

**October 25th, 2012 - Bounty set sail from New London to purposefully enter known gale-force conditions on a course to cross the path of Hurricane Sandy. The crews experience (according to testimony) included the following facts:**

1. Ten crewmembers (63%) had been aboard Bounty for less than 8 months (Including Sanders - 2nd Mate - who would be in charge of navigational watches and developing the sail plan)

2. Six of those had never been aboard any other tall ship - including Cleveland (3rd Mate).

3. Sanders (2nd Mate) had one summer aboard Margaret Todd - a steel-hulled schooner as a summer intern, and no other tall ship experience.

4. Nine crewmembers had never sailed on another tall ship.

5. The engineer, Barksdale, had a total of 4 days sea time on Bounty and had no experience or training whatsoever on marine diesel engines or generators.

6. The average total tall-ship experience for a deckhand was 1 year. The average Bounty experience for a deckhand was six months.

**Red** = no tall ship experience other than Bounty.
**Orange** = other tall ship experience limited to non-paid or summer internship positions
**Green** = relevent professional experience on other tall ships.

Years

18.00
16.00
14.00
12.00
10.00
8.00
6.00
4.00
2.00
0.00

17 — Walbridge
4.62 — Cleveland
4.45 — Faunt
2.53 — Groves
2.45 — Svendsen
1.45 — Salapatek
0.69 — Prokosh
0.61 — Sanders
0.53 — Christian
0.46 — Warner
0.45 — Scornavacchi
0.45 — Sprague
0.44 — Jones
0.16 — Hewitt
0.12 — Barksdale
0.00 — Black



**Crew with no tall-ship experience prior to Bounty**

Exhibit 4



Exhibit 5